UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

CYNTHIA  KEOUGH,                                  )
                                                              )
                            Plaintiff,               )
                                                              )
            vs.                                       )
                                                              )         No. 1:10-cv-01654-SEB-DML
ELI LILLY  & COMPANY,                      )
                                                              )
                            Defendant.             )

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is now before the Court on Defendant's Motion for Summary Judgment [Docket No. 60], filed on November 30, 2012.  Plaintiff, Cynthia Keough, brings this action against her current employer, Defendant, Eli Lilly & Company ("Lilly"), alleging that Lilly discriminated against her because of her race (African-American) in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq*., and retaliated against her for her complaints of discrimination, in violation of § 1981.[1]  For the reasons detailed in this entry, we <u>GRANT</u> Defendant's Motion for Summary Judgment.

**<u>Factual Background</u>**

Lilly is a global pharmaceutical company that develops and manufactures pharmaceutical products.  Lilly hired Ms. Keough in May of 2000 as a Systems Analyst

---

[1] This case is related to others before the Court all of which were originally part of a class action complaint.  *See Welch v. Eli Lilly & Co.*, 1:06-cv-00641-RLY-DML.  The class action was never certified and the individual cases were severed on September 29, 2010.  We now rule on the individual cases that were assigned to the undersigned judge.

in Lilly's Information Technology ("IT") organization at Pay Grade Level ("PGL") 52.
Less than a year later, she was promoted to a Team Leader position at PGL 56, skipping
PGL 54.[2]  Roberta Rowland served as Ms. Keough's supervisor from June 2001 until
February 2004.  Ms. Rowland testified that she did not experience any problems with Ms.
Keough and that Keough performed well as a team leader.  In March 2004, Ms. Keough
laterally transferred to another team leader position located at Lilly's facility in
Greenfield, Indiana, which is where the issues raised in this litigation arose.

**Plaintiff's Relationship with Supervisors and Team Members**

As a team leader in the Greenfield facility, Ms. Keough was responsible for a team
charged with providing network and desktop computer support to other employees at the
site.  For approximately six months following her transfer, Ms. Keough was directly
supervised by Bryan Swallow and also had "dotted line" reporting relationships with
Tracy Kemp and Kimberly Wang.  A site-wide reorganization occurred in September
2004, after which Ms. Keough began reporting directly to Ms. Kemp while continuing
her "dotted line" reporting relationship with Ms. Wang.

According to Lilly, upon being transferred to Greenfield, Ms. Keough had
difficulty supervising her team, which led the team to perform poorly in terms of its
delivery of service to internal customers.  Ms. Wang testified that Ms. Keough's team
struggled to meet response time expectations of the Sales and Marketing Group in their
efforts to resolve ongoing bandwidth issues.  Ms. Wang also noticed that Ms. Keough
was absent from various meetings with key internal contacts and failed to take full

---

[2] It is undisputed that such a jump in PGLs is a rare occurrence at Lilly.

advantage of coaching opportunities offered by Wang and others reporting to her. Another of Lilly's internal customers (the Director of Toxicology) relayed concerns regarding Ms. Keough's team, stating that some of Ms. Keough's communications to the site were not as clear and professional as he hoped they would be.

Not long after Ms. Kemp began directly supervising Ms. Keough, Keough requested that Kemp meet with each member of her team in an effort to better understand the situation.  According to Ms. Kemp, Ms. Keough's relationship with her team was "strained" and her team members expressed frustrations with Keough's "approach of coming into the role and not spending time with them to fully understand what they were doing and taking what they considered to be some actions that impacted them."  Kemp Dep. at 57, 59-60.  Specifically, Ms. Keough's team members allegedly referenced their dissatisfaction with regard to the approach Keough took in removing their company-provided cell phones as well as with her decision to terminate a particular contract employee.  *Id.* at 59-60.

Ms. Keough, however, alleges that the Greenfield team had multiple behavior and performance issues prior to the time she began supervising its members.[3]  According to Ms. Keough, when she began supervising the team Ms. Wang informed her of such issues.  In her testimony, Ms. Wang conceded that the Greenfield team was slow in providing services both prior to Ms. Keough's becoming the team leader as well as after.

---

[3] As an example, Ms. Keough alleges that, when she first arrived in Greenfield, she found a sign pinned up on her cubicle with pictures of the two previous team leaders (Larry Crump and Marjorie McCoy, both Caucasian) circled and crossed out.  Ms. Keough's name and a blank space for her picture were also crossed out on the sign.

Ms. Keough alleges that, contrary to Ms. Wang's recollection of her attendance, the only time she was absent from meetings was when they were held while she was on leave or when she had another meeting that directly conflicted.  She further noted that it was Ms. Wang herself who canceled or rescheduled a number of meetings with Ms. Keough. Keough 2013 Decl. ¶ 4.  In any event, the issue of Ms. Keough's attendance at meetings or training sessions was never raised during her evaluations.  *Id.*

Ms. Keough alleges that she did not receive the same level of support from her superiors that the Caucasian team leaders received.  Her first supervisor, Mr. Swallow, conducted bi-weekly meetings with the Caucasian team leaders under his supervision to offer guidance and discuss strategy for projects.  According to Ms. Keough, despite the fact that Mr. Swallow knew that she had a difficult team to supervise and that she had requested additional meetings, he met with her to strategize only twice over seven months.  Unlike the other team leaders, Ms. Keough was responsible for a budget, which, under Lilly's policies and procedures, required frequent meetings with managers.  Ms. Keough alleges that, although Mr. Swallow met with his own supervisor about budgetary issues on a weekly basis, he refused to meet with her to provide guidance on such issues. Similarly, Ms. Keough alleges that, between July 2004 and October 2004, she met with Ms. Wang only once to discuss the budget, despite having repeatedly requested more regular assistance from Ms. Wang.  Ms. Keough contends that Ms. Kemp also ignored Keough's request for help and support with her team, while providing more guidance to the Caucasian team leaders on various issues, including budgeting.  Keough 2009 Decl. ¶¶ 10-13.

4

**Plaintiff's 2004 Performance**

In early October 2004, Ms. Keough had discussions with Ms. Kemp about the possibility of her moving to an individual contributor (non-supervisory) role, which Ms. Keough anticipated would be a lateral move.  In November 2004, Ms. Keough took a six-week paid leave of absence that extended through January 2005.  In December 2004, while Ms. Keough was on leave, management performed a Talent ID Assessment[4] to evaluate her potential for future administrative roles.  According to Ms. Kemp, she (Ms. Kemp) gave minimal input at the Talent ID session, but did state that Ms. Keough's performance in the few years prior to the assessment was not as good as most employees at her level, despite having at that time only been Ms. Keough's supervisor for a few months.  Kemp Dep. at 85, 94-95.  Based on the results of the assessment, Ms. Keough was given the option of transferring to an individual contributor position.[5]  At that time, Ms. Keough expressed her appreciation for Ms. Kemp's "hands-on involvement and support" and agreed to transfer to an individual contributor role effective in March 2005.

A few weeks after the Talent ID session, Mr. Swallow and Ms. Kemp completed Ms. Keough's performance review for 2004 awarding Ms. Keough an overall rating of "S" (successful).  However, several versions of the 2004 Performance Management Assessment of Ms. Keough appear in the record, each providing varied ratings of her performance in the seven individual performance categories assessed.  In the version on

---

[4] There are several different versions of Ms. Keough's Talent ID Assessment in the record.  *See* Swallow Dep. Exhs. 4, 5; Kemp Dep. Exhs. 10-14.

[5] Talent ID Assessments are usually used to assess potential for leadership at a higher/management level.  However, in Ms. Keough's case, the results of the assessment resulted in a move from a supervisory to a non-supervisory role.

which Lilly relies, Ms. Keough received a "needs to improve" rating on three of the

seven individual performance behavior ratings.  According to Ms. Kemp, Ms. Keough's

ratings were affected by her weak relationships with her team members.  Although Ms.

Keough received a merit pay increase in 2005 of $2,070 (or 2.5%) based on her 2004

performance, Mr. Swallow and Ms. Kemp noted that her performance needed to improve

in order for her to be considered for future merit increases.

Ms. Keough highlights certain differences in ratings between Ms. Kemp's

assessment of Keough's performance on the Talent ID Assessment and the Performance

Evaluation which was completed a few weeks later.  For example, in Ms. Keough's

Talent ID Assessment, Ms. Kemp evaluated Keough's performance in the category

"Anticipates Changes and Prepares for the Future" as being "Better than Most."  Kepm

Dep. Exh. 14 at 2.  However, in Ms. Kemp's Performance Management Evaluation of

Ms. Keough, Keough was ranked as "Needs to Develop," despite Kemp's

acknowledgement that all the feedback contained in the Performance Management

Evaluation related to that category was positive.  Kemp. Dep. 48-49.

**Plaintiff's Bid for SPARC Promotion in 2006**

Throughout the time period relevant to this litigation, Lilly's "technical ladder"

promotions from one PGL to the next PGL were distinct from "administrative path" or

"managerial" promotions.  Technical ladder promotions were based on an employee's

consistent demonstration of PGL-specific technical and behavioral competencies and

criteria over time, while managerial promotions were based on the employee's

application and selection for the position.  Thus, although Ms. Keough was promoted to

6

PGL 56 as a result of her selection as a Team Leader in 2001, this did not mean that she had achieved PGL 56 for purposes of the technical ladder process.  Burton Aff. ¶¶ 10-11.

Technical track promotions to PGL 54 and higher were governed during the relevant time period by the Lilly IT organization's Systems Promotion and Review Committee ("SPARC") process.  Candidates seeking promotion through the SPARC process worked with their supervisor to create a nomination form describing "STARS," or specific accomplishments during prescribed time periods, demonstrating high levels of technical proficiency.  SPARC candidates were expected to have consistently demonstrated top performance at least during the four years preceding their candidacy, which generally meant receiving year-end performance ratings equivalent to "4" or "5" in years when numerical ratings were used, or "S" or "E" ("exemplary") in years when letter ratings were given.  Lilly set general expectations regarding the minimum amount of time employees were to spend at a given PGL before progressing up the technical ladder promotion path, but there were no automatic time-based promotions to higher PGLs.  Burton Aff. ¶¶ 11-12.

In May 2005, Ms. Keough spoke with Ms. Burton in Human Resources to voice her concern that her performance rating as a team leader would impact her ability to seek a promotion through the SPARC process.  Although Ms. Burton apparently entered a note to remind herself to speak with Mr. Swallow and Ms. Kemp regarding feedback for development, she does not recall having had any conversations with them on this topic. Burton Dep. at 46-47.

Because Ms. Keough had attained PGL 56 by virtue of her managerial position as Team Leader, and had not achieved PGL 56 (or even PGL 54) via the technical ladder, she dropped to PGL 54[6] when she stepped down as Team Leader but with the possibility of further promotion through the SPARC process.  Almost immediately after transitioning to the PGL 54 individual contributor role in 2005, Ms. Keough expressed an interest in seeking a technical promotion to PGL 56 during the 2006 SPARC promotion process.  Ms. Keough's supervisors did not support her candidacy in 2006, however, despite the fact that she had received a high successful performance rating for 2005.  According to Lilly, this lack of support was due to Ms. Keough's failure at that time to have accumulated the requisite number of years of successful performance, since she had been in her PGL 54 role only since March 2005[7] and her STARS were considered weak.

Ms. Keough contends that she was demoted from PGL 56 to PGL 54 as a result of being the Team Leader of the underachieving Greenfield Team, while her Caucasian predecessors in the position remained at the same PGL after they transferred, despite the fact that the same performance and behavior problems were present during their tenures.

**Plaintiff's Complaints of Discrimination and Retaliation**

In 2005, Lilly supervisors were distributing bonuses (of up to $100) in the form of American Express gift checks to their supervisees.  At some point during the year, Ms.

---

[6] Prior to becoming a Team Leader, Ms. Keough had attained only PGL 52.  Thus, she could have been returned to PGL 52 after she stepped down from the Team Leader position, but Lilly instead elected to drop her only one pay grade level to PGL 54.
[7] According to Ms. Keough, she was informed that as a result of her having been put into a new PGL, it was as if she were starting over for purposes of the SPARC process.  Keough Dep. at 195.

Keough noticed that one of her Caucasian coworkers received a gift check, for which she congratulated him.  He informed Keough that their supervisor, Kimberly Young, had given him the check at the end-of-the-year Performance Management review, and he expressed surprise that Ms. Keough had not received one.  Because Ms. Keough had received a high successful review in 2005, she was concerned about being omitted from the distribution of the gift checks, so she inquired of the other members of her team to determine whether they had received bonuses.  According to Ms. Keough, she discovered that every member of her team who was eligible (Lilly had a yearly cap for gift cards and some members had already reached the limit) had received a gift check, except for the two African American members of the team, to wit, herself and Ramonica Love.

Ms. Keough complained to Denola Burton in Human Resources that she and Ms. Love were the only two members of the team who did not receive American Express gift checks.   Following her complaint to Human Resources, Ms. Keough received a poor 2006 interim performance review by Ms. Young.  Shortly after that review, in July 2006, Ms. Keough filed an internal EEO Hotline report alleging race discrimination and retaliation arising out of her failure to receive an American Express gift check, which resulted in retaliation against her following the filing of her complaint.

Lilly contends that Ms. Keough's director, Mike Scholl, and the Human Resources department both investigated Keough's allegations regarding the American Express Gift Checks and determined that Keough was mistaken: Ms. Young had not awarded all of the gift checks; rather, certain individuals in the newly constituted team had received gift checks from their prior managers based on their prior assignments.  Ms. Burton (in

9

Human Resources) testified that she remembers speaking with Mr. Scholl about the gift checks and receiving what she thought was an acceptable explanation (although she does not remember precisely what that explanation was). She also does not remember having taken any further action on this issue. Burton Dep. at 57-59. Mr. Scholl testified that he remembers asking Ms. Burton to pull the appropriate records in their files to determine which employees were given gift checks (because he did not have access to those records); he does not remember the issue of the gift checks being part of any investigation by Human Resources nor does he remember providing Human Resources any information related to that issue. Scholl Dep. at 30-31, 38-39.

On August 1, 2006, Ms. Keough filed another EEO hotline report regarding race discrimination in promotions. Specifically, Ms. Keough stated that her supervisors, Mr. Scholl and Ms. Young, did not support her for a promotion, choosing instead to support another employee, Debbie Knerr. Mr. Scholl testified that he does not recall any investigation by Human Resources into the issues raised in Ms. Keough's August 1 complaint.

After she filed her first EEO complaint in July 2006,[8] Ms. Keough was moved to new areas six times between 2006 and March 2009. According to Ms. Keough, these frequent transfers prevented her from making meaningful contributions to her teams, and consequently, prevented her from obtaining the necessary STARs required to receive promotions.

---

[8] In April 2006, a few months before Ms. Keough filed her complaints with Lilly's EEO hotline, a class action alleging race discrimination was filed against Lilly in federal court. In October 2007, Ms. Keough was named a class representative in that case.

**Plaintiff's Subsequent Requests for SPARC Promotions and 2008 Transfer**

Ms. Keough again sought her supervisors' support for a technical promotion in 2007 and 2008, but in both instances her supervisors (Rodney Smith and Jason Duigou) and her directors (Mike Scholl and Keith Zettel) declined to support her candidacy, stating that she had not yet built the requisite record of consistently successful performance required for SPARC consideration.  Correspondence between Ms. Keough's supervisors and Human Resources during this time period references the fact that Keough was not being provided "meaningful assignments" that would allow her to show "deliverables."  Zettel Dep. Exhs. 2, 3.

In 2008, Ms. Keough's position was eliminated as part of a broader downsizing initiative, but Human Resources assisted her in finding a lateral position that would not adversely impact her pay.

**Defendant's 2009 Pay Restructuring**

In 2009, Lilly instituted a company-wide pay restructuring in which numeric PGLs were replaced with alphanumeric pay grades.  The resulting alphanumeric pay grades for IT did not correspond to the previous numeric PGLs; thus, a group comprised of members of management and Human Resources collaborated to assign an alphanumeric designation for each position based on the duties and responsibilities of the position, as opposed to being based on characteristics of the individual occupying each position.  The process used to determine merit pay increases did not change as part of this restructuring.

As a result of the restructuring, Ms. Keough's PGL 54 position was converted to a position under the new system classified as "P3."  The identity of the individuals making

the decisions as to which positions were to be designated at each level is unknown, but Ms. Keough believes that her then-current team leader, Pam Rector, had input into the decision relative to her position.

**Plaintiff's EEOC Charge**

On November 10, 2009, Ms. Keough filed a Charge of Discrimination with the EEOC and the Indiana Civil Rights Commission ("ICRC") alleging race discrimination and retaliation. Specifically, Ms. Keough alleged that for racially discriminatory reasons Mr. Zettel and her team leader, Mr. Daigou, had denied her a promotion.

**Plaintiff's Application for a Promotion in 2010**

In August 2010, Ms. Keough applied for an open P4 position which would entail her reporting to Mr. Zettel. Though the department had been reorganized, the position was essentially the same as that previously occupied by her prior supervisor, Mr. Duigou. The position was on a team on which Ms. Keough had previously worked, so she had direct knowledge of the team members and their job duties. The duties of the position included significant responsibility for overall direction and management of LillyNet, Lilly's Sharepoint environment. The position also required major supervisory and budgetary responsibilities as well as vendor management duties and responsibility for resolution of global customer issues.

Ms. Keough was one of sixteen candidates who applied for the P4 position and one of only five who received an interview. Ms. Keough was the only African American applicant. Ultimately, Mr. Zettel selected W. Mark Hudson for the position. Both Ms. Keough and Mr. Hudson had received successful ratings or higher in all of their

performance evaluations since 2000. Lilly contends that the decision to promote Mr. Hudson was not based on race, but on Mr. Zettel's conclusion that Mr. Hudson had the most relevant experience for the job in terms of technical, supervisory, and vendor management skills. Ms. Keough contends, however, that she had more supervisory experience than Mr. Hudson had as well as more direct knowledge of the team and the specific role being filled. Currently, Ms. Keough remains at the same pay grade level she was assigned when she was transferred out of the team leader position in 2005.

Ms. Keough filed the instant complaint on December 17, 2010.

## Legal Analysis

### I.     Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986), will defeat a motion for summary judgment.  *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case.  *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes.  *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).  Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate.  *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989).  But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated.  *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003).   Further, a failure to prove one essential element "necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.

A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999); *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993).

The summary judgment standard is applied rigorously in employment discrimination cases, because intent and credibility are such critical issues and direct evidence is rarely available. *Seener v. Northcentral Technical Coll.*, 113 F.3d 750, 757 (7th Cir. 1997); *Wohl v. Spectrum Mfg., Inc.*, 94 F.3d 353, 354 (7th Cir. 1996). To that end, we carefully review affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination. However, the Seventh Circuit has also made clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts. *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997).

## II.    Race Discrimination

Ms. Keough first alleges that she was discriminated against because of her race, in violation of both 42 U.S.C. § 1981 and Title VII. The substantive standards and methods of proof that apply to claims of racial discrimination under Title VII also apply to claims under § 1981. *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 806 (7th Cir. 1999) (citations omitted). A plaintiff may establish a case of discrimination using either the

direct or indirect method of proof.  Here, Ms. Keough is proceeding solely under the

indirect method.  To establish a prima facie case using the indirect method as set forth in

*McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973), a plaintiff must establish that:

(1) she was a member of a protected class; (2) she adequately performed her employment

responsibilities; (3) despite adequate performance, she suffered an adverse employment

action; and (4) she received different treatment than similarly situated persons who were

not members of the same protected class.  *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d

781, 790 (7th Cir. 2007) (citation omitted).  If the plaintiff is able to make such a

showing, the burden shifts to the employer to come forth with a "legitimate, non-

discriminatory reason" for its actions.  *Hill v. Potter*, 625 F.3d 998, 1001 (7th Cir. 2010).

If it is able to do so, it will prevail unless the plaintiff presents evidence that the

employer's given reason is merely a pretext for discrimination.  *Serednyj v. Beverly

Healthcare, LLC*, 656 F.3d 540, 551 (7th Cir. 2011) (citation omitted).

### A.  Demotion from Team Leader Position

Ms. Keough contends that her poor performance evaluation, reduced merit

increase, and subsequent demotion from the Greenfield Team Leader position to an

individual contributor PGL 54 position were the result of race discrimination.  Ms.

Keough maintains that her predecessors in the position, Mr. Crump and Ms. McCoy, both

Caucasian, struggled with the same behavioral and performance issues which afflicted the

Greenfield Team, yet unlike her, neither suffered any adverse employment action as a

result of those deficiencies.  Instead, Mr. Crump and Ms. McCoy both received lateral

transfers out of the Team Leader position and continued to enjoy opportunities for advancement within Lilly.

Lilly does not challenge the first three prongs of Ms. Keough's prima facie showing, but contends that her disparate treatment claim fails because she has been unable to show that either Mr. Crump or Ms. McCoy is a similarly situated comparator. We agree.  In order to satisfy the similarly-situated inquiry, a plaintiff typically must show that a comparator had the same supervisor; was subject to the same standards; and "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012).  In conducting this analysis, we remain mindful that the court is "looking for comparators, not clones." *Id.* at 846.  Whether a comparator is similarly situated is usually a question for the fact finder and summary judgment is appropriate only when "no reasonable fact-finder could find that plaintiff [has met her] burden on the issue." *Id.* at 847 (citation omitted).  Such is the case here: no reasonable fact-finder could conclude that Ms. Keough has established, based on comparators, that she was discriminated against on account of her race.

Critical distinctions exist between Ms. Keough's conduct and the conduct of her predecessors that prevent a meaningful comparison.  Namely, it was Ms. Keough herself who initiated discussions with her supervisors regarding her suitability for an administrative or supervisory role or whether she should return to an individual contributor (non-supervisory) position.  Keough Dep. at 160-61.  Subsequent assessments

completed by her supervisors indicated that she would be better suited to the individual contributor role.  Per Lilly's policy, Ms. Keough was returned to the PGL she had occupied prior to assuming her administrative track roles, which resulted in a return to PGL 54.  Unlike Ms. Keough, there is no indication that Mr. Crump or Ms. McCoy ever initiated such discussions with management regarding whether either would be better suited to non-supervisory roles.  Instead, both sought to (and did) transfer to other team leader roles within their same PGL.  Moreover, the record discloses that management received complaints from Ms. Keough's team members as well as from Lilly's internal business partners regarding her performance in the team leader position at Greenfield.  Ms. Keough thus has failed to establish that either of her two predecessors in the Team Leader position prompted a comparable number or similar type of complaints.  Given these material distinctions between Ms. Keough's performance and her proposed comparators', in attempting to rely on them Plaintiff has failed to establish a prima facie case of discrimination based on her 2005 transfer from a team leader position to a PGL 54 non-supervisory role.

### B.  Denial of Gift Check Bonus

Ms. Keough next argues that her failure to receive an American Express gift check when all the Caucasian members of her team apparently did was race-based discrimination.  However, this claim fails at the outset because "[f]or a claim of discrimination, an adverse employment action must materially alter the terms or conditions of employment."  *Sklyarsky v. ABM Janitorial Services-North Central, Inc.*,

494 Fed. App'x 619, 622 (7th Cir. 2012) (citations omitted).  Ms. Keough's failure to receive a discretionary incentive gift check valued at most at $100, unfair as it may have been or at least seemed to her, simply does not rise to the level of a materially adverse employment action for purposes of her discrimination claim.  *Cf. Hunt v. City of Markham*, 219 F.3d 649, 654 (7th Cir. 2000) (observing that the denial of a raise may constitute a materially adverse action, but a bonus may not because bonuses are generally sporadic, irregular, unpredictable, and discretionary on the part of the employer); *Rabinovitz v. Pena*, 89 F.3d 482, 488-89 (7th Cir. 1996) (holding there was no adverse action where lower performance rating prevented employee from receiving a discretionary bonus, but did not alter employee's responsibilities or salary).  Accordingly, we hold that Ms. Keough has failed to establish a prima facie case of discrimination based on her failure to receive an American Express gift check and her claim on this basis cannot and does not survive summary judgment.

### C.  Denial of 2006 Promotion

Although not well-developed, Ms. Keough apparently contends that her 2006 promotion denial was also discriminatory.  The only employee that Ms. Keough identifies as having been treated better than she with respect to Lilly management's support for a SPARC promotion is Debra Knerr.  Specifically, Ms. Keough alleges that, in February 2006, shortly after her supervisors failed to award her an American Express gift card, those same supervisors promoted a Caucasian employee, Ms. Knerr, over Ms. Keough.  Ms. Keough's claim is not supported by any evidence or argument establishing that Ms.

Knerr is a suitable comparator.  Under Seventh Circuit law, "unsupported and undeveloped arguments are waived."  *United States v. Turcotte*, 405 F.3d 515, 536 (7th Cir. 2005) (citations omitted).  Ms. Keough's failure to substantively address the similarly situated inquiry dooms her discrimination claim based on a failure to receive support for a promotion in 2006.[9]

### D.  2010 Denial of P4 Position

Ms. Keough further claims that, in 2010, her supervisor Mr. Zettel, acting on the basis of her race, denied her an open P4 position, awarding the position to a candidate with less supervisory experience and knowledge of the position.  As discussed above, Ms. Keough was one of sixteen candidates who applied for the position and was one of five candidates to receive an interview.  Ultimately, she was not chosen for the position.  Lilly contends that Ms. Keough's discrimination claim cannot survive summary judgment because she is unable to show that the candidate who was chosen, Mr. Hudson, was similarly situated to her or that Mr. Zettel's proffered non-discriminatory reason for hiring Hudson, to wit, that Hudson had documented technical and vendor management skills, is pretextual.

Ms. Keough contends that at the time Mr. Hudson was hired, she was more qualified than he for the P4 supervisory position because she had greater supervisory experience and "knowledge of the position," having previously worked on a team where

---

[9] Even if this claim were not waived, the evidence establishes that there are sufficient differences between Ms. Keough and Ms. Knerr, namely, their years of experience in technical positions and performance ratings to prevent a meaningful comparison between the two.

she had reported to the posted position.  Lilly rejoins that Ms. Keough has failed to

establish sufficient similarities with Mr. Hudson, having failed to offer any evidence

regarding Hudson's qualifications on either score to compare with hers and having failed

to address whether she possessed comparable technical and vendor management skills,

which were the additional stated criteria supporting Mr. Zettel's hiring decision.  In

*Coleman v. Donahoe*, 667 F.3d 835 (7th Cir. 2012), the Seventh Circuit recently

emphasized that the similarly-situated inquiry does not require comparators to be

"identical in every conceivable way," *id.* at 846, rather it merely directs that there be

"enough common factors [between the individuals] to allow for a meaningful

comparison…." *Id.* at 847 (citation omitted).   Here, although Ms. Keough and Mr.

Hudson may not have had identical backgrounds and skill sets, we cannot say that the

differences in their qualifications are "so significant that they render … comparison

effectively useless." *Id.* at 846 (citation omitted).  Because this is the only prong of the

prima facie case that Lilly has challenged, we conclude that Ms. Keough has successfully

established a prima facie case of racial discrimination.

However, there is absolutely no evidentiary support for Ms. Keough's contention

that Mr. Zettel's stated reason for choosing Mr. Hudson for the position was merely a

pretext for discrimination.  To demonstrate pretext, Ms. Keough must show that Lilly's

articulated reason for failing to award her the P4 position either: had no basis in fact; did

not actually motivate the decision to select Mr. Hudson for the position; or was

insufficient to motivate that decision. *Wells v. Unisource Worldwide, Inc.*, 289 F.3d

1001, 1006 (7th Cir. 2002) (citation omitted).  Ms. Keough has failed to provide any such evidence to establish that Mr. Zettel did not truly believe that Mr. Hudson was more qualified for the position.  She does not contend that she had a similar skill level as Mr. Hudson in the technical and vendor management areas nor does she attempt to show that those skills would have been unnecessary or unhelpful assets for performance of the position P4 position at issue.  Ms. Keough simply asserts that she had more supervisory experience and "knowledge of the position", arguing that Mr. Zettel thus erred in determining that Mr. Hudson was more qualified for the position.  However, Mr. Zettel explained that he perceived a distinction between Ms. Keough's previous experience (in which she essentially reported to the posted position) and her actual performance of the duties entailed.  Mr. Zettel concluded that, unlike Ms. Keough, Mr. Hudson had experience actually performing jobs similar to the P4 position in addition to also possessing the technical and vendor management skills noted above.  Again, there is no indication in the record that Mr. Zettel did not honestly believe that these qualifications rendered Mr. Hudson a more suitable candidate.  Instead, Ms. Keough simply disagrees with Mr. Zettel's evaluation of the skills that would be most beneficial in a candidate for the position.  It is well-established that courts "do not sit as super personnel departments, second-guessing an employer's facially legitimate business decisions." *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 693 (7th Cir. 2005) (quoting *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003)).  Because Ms. Keough has failed to establish pretext, her discrimination claim based on her failure to receive the P4 position cannot survive summary judgment.

### III.    Retaliation

Ms. Keough's retaliation claims are brought under 42 U.S.C. § 1981.[10]  To establish a claim for retaliation, a plaintiff must prove that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse employment action; and (3) there was a causal relation between the two.  *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 686 (7th Cir. 2008).  Where, as here, there is no direct evidence of retaliation, the Seventh Circuit has identified several types of circumstantial evidence that may establish a retaliatory motive including, "suspicious timing, ambiguous statements oral or written, … and other bits and pieces from which an inference of [retaliatory] intent might be drawn"; "evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently"; and "evidence that the employer offered a pretextual reason for an adverse employment action."  *Coleman*, 667 F.3d at 860 (internal quotation marks and citations omitted).

### A.  2006 Promotion Denial

Ms. Keough alleges that approximately two months after complaining to Human Resources regarding the discriminatory manner in which her supervisors, Ms. Young and Mr. Scholl, distributed the American Express gift checks, those same supervisors retaliated against her by supporting Ms. Knerr for promotion over her.  Mr. Scholl admits that he was aware at the time he supported Ms. Knerr for a promotion that Ms. Keough

---

[10] The substantive standards and methods of proof applicable to claims of retaliation under Title VII also apply to claims brought pursuant to § 1981.  *Vakharia*, 190 F.3d at 806 (citations omitted).

had complained about the gift checks, but there is no indication that he understood her complaint to be race-based.  The evidence also fails to establish whether Ms. Young had any knowledge of Ms. Keough's complaint before supporting Ms. Knerr for a promotion. *See Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1008 (7th Cir. 2000) (recognizing that "an employer cannot retaliate when it is unaware of any complaints").

Even if Mr. Scholl or Ms. Young had the requisite knowledge of Ms. Keough's protected activity, her retaliation claim based on her 2006 promotion denial still would fail.  The only evidence Ms. Keough cites to support a causal link between her complaint and the adverse employment action is the fact that her supervisors' decision not to support her for a promotion in 2006 allegedly came two months after she had complained to Human Resources.  It is well-established under Seventh Circuit law that "[s]uspicious timing alone rarely is sufficient to create a triable issue" and "mere temporal proximity is not enough to establish a genuine issue of material fact" at the summary judgment stage. *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008) (quotation marks and citations omitted).  Ms. Kough has proffered no other evidence to undercut Lilly's proffered nondiscriminatory reason for declining to support her 2006 candidacy, to wit, that she had not been in a PGL 54 technical track position long enough to satisfy the established eligibility requirements for a promotion.  For these reasons, Ms. Keough's retaliation claim based on her failure to receive a promotion in 2006 cannot survive summary judgment.

**B.  Post-2006 Transfers**

Ms. Keough next contends that Lilly retaliated against her by subjecting her to a series of transfers throughout the time period from 2006 to 2009, which she contends prevented her from making meaningful contributions to her teams and thereby prevented her from obtaining the necessary STARs required to receive promotions.  However, Ms. Keough's claim is a nonstarter because among other things she has failed to identify a single decision-maker responsible for any of her transfers, let alone anyone who said or did anything in relation to her transfers that could give rise to an inference of retaliatory motive.  Without knowing the identity of the decision-makers it is also impossible to determine which (if any) were even aware that Ms. Keough had engaged in protected activity.  It is insufficient merely to present evidence that a retaliatory motive *could* have influenced the decision-maker.  Instead a plaintiff alleging retaliation must present evidence that a "retaliatory motive *actually* influenced the decision-maker …."  *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1108 (7th Cir. 2012) (emphasis in original).  Ms. Keough has simply failed to do so here.

### C.  2010 Denial of P4 Position

Finally, Ms. Keough alleges that, in 2010, her supervisor Mr. Zettel chose another employee, Mr. Hudson, to fill an open P4 position over her in retaliation for her having filed a Charge of Discrimination with the EEOC in November 2009 that specifically alleged that Mr. Zettel had discriminated against her based on her race.  However, Ms. Keough has not shown that Mr. Zettel was aware of her EEOC Charge at the time he made the decision to select Mr. Hudson for the P4 position, a matter on which she has the

burden of proof.  Moreover, as discussed above in reference to her discrimination claim, even if we were to conclude that Mr. Hudson is similarly situated to Ms. Keough, there is no other indication that Mr. Zettel's hiring decision was based on an improper motive or that the reasons given for his hiring decision, to wit, that he believed Mr. Hudson had technical skills and vendor management skills that the other candidates did not, were pretextual.  In short, Ms. Keough again has failed to present evidence from which a reasonable jury could conclude that Mr. Zettel failed to choose Ms. Keough to fill the position she sought in 2010 because she had filed the 2009 EEOC charge.

## IV.    Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED.  Final judgment shall enter accordingly.

IT IS SO ORDERED.

Date:  _____09/06/2013_____

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Ellen E. Boshkoff
FAEGRE BAKER DANIELS LLP - Indianapolis
ellen.boshkoff@faegrebd.com

Joseph C. Pettygrove
FAEGRE BAKER DANIELS LLP - Indianapolis
joseph.pettygrove@FaegreBD.com

Neil L. Henrichsen
HENRICHSEN SIEGEL PLLC
nhenrichsen@HSLawyers.com

Joseph F. DeBelder
HENRICHSEN SIEGEL, P.L.L.C.
jdebelder@hslawyers.com